## HASSELTINE v. SOUTHERN RY.

1. APPEAL—JURY.—Appellant is not entitled to a new trial because the jury disregarded an instruction which would be applicable to one view of the evidence when the evidence is susceptible of another inference.

MR. JUSTICE JONES *thinks the evidence here susceptible of no other reasonable inference than the one applicable to the instruction disregarded.*

2. LIABILITY OF RAILROAD COMPANY FOR FAILURE TO INSTRUCT PASSENGER OF QUARANTINE.—Where a railroad company is fully advised of a quarantine, and undertakes, through its conductor, to give information on the subject to passengers, it is liable for the consequences of failure to give information as to a quarantine which would manifestly make an uninterrupted journey impossible.

MR. JUSTICE JONES *thinks the expulsion of plaintiff from defendant's train and its consequent expense, annoyance and delay was proximately caused by the acts of quarantine officers, and that sufficient notice was given plaintiff by defendant's servants to make it his own negligence not to have provided himself with a health certificate.*

Before O. W. BUCHANAN, special Judge, October Term, 1905, Lancaster. Affirmed.

Action by J. A. Hasseltine against Southern Railway Co. From judgment for plaintiff, defendant appeals.

*Messrs. B. L. Abney, E. M. Thomson* and *W. H. Townsend,* for appellant. (No argument furnished Reporter.)

*Mr. J. Henry Foster,* contra, cites: *Passenger must be furnished every necessary facility for reaching his journey comfortably:* 53 S. C., 210; 69 S. C., 132; Thomp. on Neg., 35, 37, 33, 187, 544, 558. *Carrier must exercise highest degree of care:* 65 S. C., 388; 67 S. C., 65; 55 S. C., 389; 62 S. C., 136; 9 Rich., 89; 41 S. C., 440. *Defendant is liable if its servants act within apparent scope of their authority:* 37 S. C., 377; 58 S. C., 143; 67 S. C., 391; 37 S. C., 198; 3 S. C., 9.

September 8, 1906. The opinion of the Court was delivered by

MR. JUSTICE WOODS. The plaintiff, a passenger on the defendant railroad on his way from Jacksonville, Fla., to Columbia, S. C., for lack of a health certificate was required by the quarantine officers of the city of Savannah to leave the train at the village of Burroughs, where he was unable to obtain food or lodging for the night; was forced to incur the

expense of traveling to Jessup, fifty miles in the opposite direction, and resume his journey to Columbia from that point; and was delayed twenty-four hours in reaching his destination. For all this he recovered a judgment against the defendant railroad company for $1,000 damages, under the allegations that he was ignorant of the Savannah quarantine, while the defendant company which sold him the through ticket had full knowledge of it and the requirement of a health certificate by the Savannah health authorities; that the ticket agent who sold the ticket failed to stamp it subject to quarantine or to notify plaintiff of the quarantine being in force; that the conductor while informing plaintiff of Columbia quarantine said nothing of the Savannah quarantine. There was evidence on the part of the plaintiff tending to sustain all these allegations. On the contrary, the conductor and other employees of the defendant testified to giving plaintiff express notice of the quarantine and that a health certificate would be required of him before he could pass through the city of Savannah, and received the reply from him that he would take his chances of getting through without the certificate. There is, therefore, no dispute that the conductor, defendant's agent in charge of the train, undertook to inform the plaintiff as to quarantine; and the issue of fact was whether, knowing of the Savannah quarantine, he misled the plaintiff by failing to tell him of it, or the plaintiff took the risk of the quarantine after full notice. This issue was submitted to the jury, and the finding was against the defendant.

The Circuit Judge charged the jury: "If the plaintiff by exercising the care of a man of ordinary care and reason, knew, or ought to have known, of these quarantine regulations, and did not do it, it is his own fault." The defendant by his first exception insists a new trial should have been granted, because the verdict of the jury was in disregard of this instruction. The exception is not well founded, because the evidence was not such as to admit of no other inference than that a man of ordinary

reason ought to have known of the existence of the Savannah quarantine, and the jury did not go beyond their right in finding against the defendant on this issue. If the plaintiff's testimony is credible, and that was for the jury, the conductor by mentioning the Columbia quarantine misled him into supposing he would have no trouble until he reached that point. As to the Columbia quarantine, the plaintiff testified he concluded to go on and undertake to get a health certificate from Lancaster, his former place of residence, which was not far from Columbia, and if he had been detained in Columbia he would have had no remedy, for as to that he took the risk. The evidence of the railroad employees is very strong, it is true, to the effect that they gave him specific notice of the Savannah quarantine; and it seems highly improbable, with full knowledge of the quarantine there, they would have failed to impart their knowledge to plaintiff when notifying him of the Columbia quarantine. Yet all this was for the jury to decide, and without rejecting the scintilla doctrine, we can see no way for this Court to interfere.

The defendant further insists that the Circuit Judge erroneously instructed the jury, in effect, that it was the duty of the conductor or some agent of the railroad company to inform the plaintiff as a passenger of the existence of the quarantine. The interesting question does not arise in this case whether a passenger may rely on a railroad company to advise him on purchasing a ticket of a quarantine regulation which will interfere with his continuous journey. The much simpler question here is whether, when the railroad company is fully advised of the quarantine and undertakes through its conductor to give information on that subject to one of its passengers, it is liable for the consequences of failing to give him information as to a quarantine which would manifestly make his uninterrupted journey impossible. There can be no doubt that the principle laid down in *Gillman* v. *Ry. Co.*, 53 S. C., 210, 31 S. E., 224, and other cases, that a passenger is entitled to ask for and receive all

information necessary to enable him to reach his destination comfortably, safely and promptly, is applicable, and if the testimony of the plaintiff be accepted, the carrier would be liable. Under the admitted facts of this case, the company was bound to inform the passenger, and there was no error in the charge on this point.

It is the judgment of this Court, that the judgment be affirmed.

MR. JUSTICE JONES, *dissenting.* I think there should be a new trial in this case.

1. The only reasonable inference from the testimony is that plaintiff was informed by defendant's agents that his passage from Jacksonville, Fla., to Columbia, S. C., would probably be interrupted because of quarantine regulations unless he had a health certificate, and plaintiff was willing to take passage subject to that risk.

The plaintiff, at folios 46-47, testified: "Q. State precisely what that conductor stated to you? A. When I started to get on the train he asked me where I was going. I told him I was going to Columbia. He said, 'Have you a health certificate?' I said, 'No.' He said, 'You can't get into Columbia unless you have a health certificate.' I asked him why. He said Columbia was quarantined. I thought a moment, and thought if I could get that close home I could get a health certificate and get home. I told him I was willing to take my chances of getting a health certificate at Columbia, and put my grip in the car and walked out the other end of the car, and there was a train man there, I guess; I asked him did he know anything about Columbia being quarantined. He said no, and he never said a word about Savannah being quarantined." At folios 50-51, he testified: "Q. Why didn't you make some effort to get a health certificate after your conversation with the conductor? A. Well, it was so near train time, and I thought if I was going to be put off at Columbia I could get a health certificate from here (Lancaster, S. C.),.

10—75

quicker than I could from Miami, Fla. Q. So, from what the conductor told you, you thought you wouldn't be required to get a health certificate until you got to Columbia? A. Yes, sir. Q. Did he mislead you? A. He certainly did. Q. did you rely on the information he gave you? A. I did."

A. A. Morrison, a flagman of defendant, testified, at folios 221-224: "I am stationed at the train there (Jacksorville), to see that passengers have the right tickets for our train, and he (plaintiff) came there to board the train. I asked him where he was going, asked him to see his ticket. He showed me his ticket, and I asked him if he had a health certificate. He said he could have gotten one at Miami if he had known it, but they told him he didn't need a health certificate, and on his arrival in Jacksonville he would have to have a health certificate. Q. And that he was told in Miami he wouldn't need one? A. Yes, sir. Q. And he had been informed after he reached Jacksonville? A. Yes, sir. And he asked me what I thought about his getting through. I told him I didn't think he would be able to get through; and he asked me if I knew whether Columbia was quarantined or not. I told him I did not, not that I knew of. I asked him to go and talk with the conductor in regard to the quarantine of Savannah. So went then to see the conductor. After talking with the conductor— Q. You say he went off to talk, as you supposed, with the conductor? A. Yes, sir. I showed him the conductor. Q. How long before he came back? A. I think between five and ten minutes. Q. Did he have anything to say then? A. Yes, sir. When he came back the baggage master was there at that time. He and I were talking about it, and I asked him if he had made any arrangements to get a health certificate. He said no, that he had not. Said he was going to chance it through any way; and the baggage master told him his ticket was good on train 34 the next morning. Q. Now, what time was this conversation when he came to you? A. When he first came to the train it was about 7.10. Q. About 7.10? A. Yes, sir. Q. And it was soon after that that he had the conversation?

A. I notified him that he had thirty-five minutes before the train left.   Q. What time does that train leave Jacksonville? A. 7.55.   Q. When does the next Southern leave for Columbia?   A. 9.10.   Q. The next day?   A. Yes, sir.   Q. 9.10 the next morning?   A. Yes, sir.   Q. After talking with you and the baggage master, then what did he do?   A. Well, he said he was anxious to go through, and said he was going to chance it."

R. B. Price, the conductor of defendant, testified, at folios 237-238: "Q. Do you remember seeing the plaintiff, Mr. Hasseltine, here, in Jacksonville?   A. Yes, sir.   Q. Where did you first see him?   A. Well, about twenty-five or thirty minutes before leaving time.   Q. Twenty-five or thirty minutes before leaving, what conversation did you have with him, if any?   Just state.   A. He asked me if that was the Southern train to Columbia.   I told him it was.   Asked him if he had a health certificate.   He said no, he didn't.   I told him they would require him to get one before he could get through Savannah.   He said, well, he didn't have one, he didn't know what he would do; and he walked across the platform, I suppose about twenty or thirty feet, and engaged in conversation with a couple of gentlemen standing there for about five minutes.   Q. Were those gentlemen he went off talking to employees or strangers?   A. No, sir.   They were strangers to me.   In about five minutes he came back to me and said, well, he guessed he could get through all right, he guessed he would chance it.   That was all that was said."

J. V. Nichols, baggage master of defendant, testified, at folio 248: "Q. Do you remember seeing Mr. Hasseltine, the plaintiff here, at Jacksonville?   A. Yes, sir.   Q. Where did you first see him, and what took place between you?   A. Why, he came up to the train to get on the train, and asked the flagman if that was the train for Columbia.   The flagman says, 'Yes.'   I was standing there at the time.   The flagman says 'Yes,' and asked him if he had a health certificate.   He says, 'No; they informed me in Miami I didn't

need any.' The flagman says, 'Well, I don't think you can get through here without one.' And I told him, 'I think you will have trouble getting through without a health certificate.' He says, 'I am going to chance it.' " This witness further testified that he told plaintiff that Savannah was quarantined.

H. R. Cramer, a quarantine inspector, testified that he had a conversation with plaintiff at Jessup, the next day, in which the plaintiff said, "When I left Miami, I didn't know anything about it; and when I reached Jacksonville I was informed that I would need a health certificate to get to Columbia, to go through Savannah. I told him, well, personally I felt sorry for him, but as an official I couldn't sympathize with him, he couldn't blame us. He said, 'No, I don't blame any of you. It was my fault. I should have a health certificate.' "

The plaintiff, in reply, did not dispute any of the foregoing testimony for defendant, except to say that he did not tell the quarantine inspector, Mr. Cramer, that it was all his (plaintiff's) own fault.

The Court charged the jury: "I charge you, that if the plaintiff, by exercising the care of a man of ordinary care and reason, knew, or ought to have known, of these quarantine regulations and did not do it, it is his own fault. If you find from the testimony that the plaintiff had notice or knowledge of the fact, or knowledge of such facts that a man of ordinary care and prudence would have drawn that inference; that a man of ordinary care and prudence would have been led by the information to the fact that quarantine was in vogue, then it was his own lookout." The jury must have disregarded this charge, as the evidence left no reason to doubt that plaintiff, when he boarded the train in Jacksonville for Columbia, received notice that his continuous passage would be interrupted by reason of quarantine regulations unless he had a health certificate. Under such circumstances the Circuit Court erred in not granting a new trial. *Buist Co.* v. *Lancaster Mercantile Co.,* 68 S. C., 526, 47 S. E., 978.

In further support of the view that there should be a new trial, I submit that there was no evidence that the delay, expulsion from the train, the inconvenience, annoyance and expense resulting from the acts of the quarantine officers were proximate results, or even the remote results, of any negligent act or omission of the defendant's agents. It must be observed that a distinction exists as to the liability of a carrier of goods and a carrier of passengers. As to goods, the carrier is an insurer, and can only exonerate itself by showing that the loss or injury thereto occurred by the act of God or the public enemy; but as to passengers, the carrier is not an insurer, and is only liable for injuries resulting from negligence or failure to exercise the care required by that particular business. The injuries alleged in this case were the result of the acts of quarantine officers of the State of Georgia, and there is no dispute that they acted under valid police laws. There was no evidence that any agent of defendant in any way assisted the quarantine officers in expelling plaintiff from the train. The defendant merely submitted to the exercise of admittedly valid quarantine regulations by officers of the law. It was not the duty of defendant as carrier to resist such officers. It was as if a sheriff had entered the train and arrested the plaintiff for violation of some valid law or ordinance. Tracing results back to their causes the plaintiff's injuries were the result of an act of the officer of the law, the officer's act was a result of the plaintiff's violation of quarantine law in failing to have a certificate, and there was no evidence that the plaintiff failed to have such certificate at that time through any breach of duty which defendant owed him, because, even if it be conceded that the highest degree of care to passengers demands that the carrier give notice of quarantine regulations requiring a health certificate, the testimony of plaintiff shows that sufficient notice was given him to make it his own negligence not to provide himself with such health certificate.